UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JALON RASHOD BROWN,

    Defendant.
_____/

Case No. 13-CR-20337

HON. MARK A. GOLDSMITH

**OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS (Dkt. 10)**

**I. INTRODUCTION**

Defendant Jalon Rashod Brown filed a motion to suppress (Dkt. 10), seeking to exclude the firearm and controlled substances that are the subject of the present indictment charging him with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute marijuana, also in violation of 21 U.S.C. § 841(a)(1). Defendant argues that the evidence was gathered pursuant to a warrantless parole-compliance search of his residence, where the Government lacked the requisite suspicion or his consent, thus violating the Fourth Amendment. The Government filed a response (Dkt. 12), and an evidentiary hearing was held on December 17, 2013. After the hearing, the Court requested, and the parties filed, supplemental briefs (Dkts. 16, 17). For the reasons set forth below, the Court denies the motion.

## II. BACKGROUND

On the evening of August 30, 2012, a group of law enforcement officers were conducting parole/probation compliance checks in Flint. 12/17/13 Hr'g Tr. at 6 (Dkt. 15). Melissa Brandt, a parole supervisor of the Michigan Department of Corrections ("MDOC"), led the compliance check team. Id. Brandt testified that the purpose of the compliance check was to verify a parolee's or probationer's residence and ensure compliance with the terms of their parole or probation. Id. A typical compliance check would include a search of a parolee's or probationer's home. Id.

At some point in the evening, Brandt approached Defendant's residence at 520 West Baker Street with three other officers: MDOC Officer Jeremy Meylan, Flint Police Department Officer Felix Trevino, and ATF Agent George Goodman. Id. at 18; Trevino Report (Dkt. 16-2). Brandt testified that when they approached Defendant's residence, several people were on the porch, including Defendant. Hr'g Tr. at 11. Officers Meylan and Trevino initiated conversation with the people, but Brandt, who believed that "the conversation was getting a little long," made clear that the officers were there to conduct a compliance check and asked Defendant for permission to enter his residence. Id. As Defendant let the officers into his residence, Brandt testified that she informed Defendant that the officers would be "going to open doors and drawers," look in Defendant's kitchen, refrigerator, and "anything he could have open access to." Id. at 12. Brandt testified that Defendant consented to the search. Id.

Brandt also stated that she asked Defendant where his bedroom was and Defendant pointed to it. Id. Defendant's residence had two bedrooms and, as Brandt explained, Defendant's bedroom was on the left. Id. at 13. Brandt stayed in the "living room area" of the residence while Officer Trevino searched the room on the left. Id. Officer Trevino called Brandt

2

to him, and when Brandt came into the left bedroom, Officer Trevino showed her a firearm he had found between the mattress and the boxspring of the bed located in the room. Id. at 13-14.

Upon finding the firearm, the officers took Defendant into custody and searched him, finding drugs, drug-trafficking paraphernalia, and cash. Id. at 14. Brandt also stated that, after the firearm had been found, Defendant said that the other bedroom, the one on the right, was his. Id.

Brandt stated that she did not have any suspicion that Defendant was doing anything illegal when the officers approached 520 West Baker Street. Id. at 17. Brandt further testified that if Defendant had refused to have his residence searched, Brandt and her team would have left, but prior to leaving would have informed Defendant that refusal would be a violation of his parole. Id. at 17-18, 37.

On cross-examination, Brandt stated that, at Defendant's parole hearing, which followed at some point after the compliance check, Brandt did not mention whether or not Defendant provided consent to search his residence. Id. at 24. Brandt explained that consent was not an issue at the parole hearing. Id.

On re-direct, Brandt also testified that Officer Meylan, whom she supervised, wrote a case note about the compliance check of Defendant, wherein Officer Meylan stated that Defendant gave consent to the search of his residence. Id. at 29-30. The case note itself, however, was not made part of the record.

A police report composed by Officer Trevino was admitted at the hearing. The report recounts the visit to Defendant's residence by the group of officers. Trevino Report (Dkt. 16-2). The report states that the officers encountered Defendant, who identified himself. Id. Then Officer Meylan

>advised him Officers were there to conduct a compliance check on his residence. Officer Trevino and Agents Meylan, Brandt, and Goodman followed [Defendant] into his apartment. Upon entering [Defendant]'s residence (Apt #1), Officer Trevino asked [Defendant] which bedroom was his. [Defendant] pointed to the Northwest bedroom and stated "That's my bedroom right there". Officer Trevino went to the Northwest bedroom as agents Meylan, and Brandt spoke to [Defendant].

Id. The report does not reference consent or the scope of any search.

With regard to the scope of the search, Brandt could not recall the exact words she used when she requested to search Defendant's residence. Hr'g Tr. at 32-33. Instead, Brandt testified that, after obtaining consent to enter a residence and search, she would routinely ask where the parolee's bedroom was, if anyone else was in the residence, and if there was anything in the residence that she should know about, particularly anything illegal. Id. Brandt also stated that the compliance check team would "open doors and drawers" and look in the kitchen and refrigerator. Id. at 33. However, Brandt could not recall whether she specifically asked Defendant if the team could look under his mattress. Id. Brandt stated that she understood looking under Defendant's mattress to be "part of the consent to search his room." Id. Brandt explained that "sometimes" she would say "mattress" because the search is intended to be more than just a "visual" scan, but, in explaining the search, she did not "get too detailed." Id. at 34.

In addition to Brandt, Defendant's second cousin, Mr. Johnnie Lee Lotts, and Defendant also testified at the evidentiary hearing. Lotts testified that he was in the residence at the time of the compliance check, on a couch a few feet from the door. Id. at 42. Lotts testified that he did not hear the officers ask for permission to enter the residence or the bedroom. Id. at 43-44. Lotts further stated that he did not hear or see Defendant give permission to the officers to enter the residence and perform a search. Id.

Defendant was the last witness to testify at the evidentiary hearing. Defendant testified that neither Brandt nor any other officer asked for consent to enter his residence, although he

4

mentioned that the outside door and the door to his apartment were both open when the officers arrived for the compliance check. Id. at 60-61. Defendant also stated that no one asked for permission to enter either of the bedrooms. Id. at 61. Defendant stated that when he was asked which bedroom was his, he pointed to the bedroom on the right, but the officers then searched the room on the left. Id. at 64. Defendant surmised that the officers were confused because of "the angle that, that we was standing at 'cause we was in the entryway." Id. at 64. Defendant also testified that he did not say anything else to the officers when they were in his residence or try to stop the officers from conducting their search. Id. at 68-69.

### III. ANALYSIS

Defendant seeks to suppress the firearm and controlled substances that form the basis of his indictment. Defendant argues that the actions of the officers amounted to an illegal search that violated the Fourth Amendment because Defendant never provided the requisite consent. In response, the Government argues that Defendant consented to the warrantless parole-compliance search of his home, including his bedroom. For the reasons stated below, the Court agrees with the Government and will deny Defendant's motion.

In cases that turn upon consent for a search, courts examine whether consent was "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999) (quotation marks omitted). "The determination of whether consent was valid is a fact-specific inquiry that must be determined by the totality of the circumstances." Id. It is the Government's burden, "by a preponderance of the evidence, to show through clear and positive testimony" that a defendant's "valid and voluntary consent to the search was obtained." Id. at 385 (quotation marks omitted).

Here, the preponderance of the evidence establishes that the encounter between Defendant and the officers occurred as Brandt recounted it. That is, Defendant consented to the search of his residence at 520 West Baker Street, including the search of his bedroom. Brandt's testimony presents a logical narrative of events, from first approaching Defendant's residence, obtaining his consent to enter his residence, and then obtaining his further consent to search his bedroom.

Furthermore, Brandt consistently testified that she obtained Defendant's consent. Brandt specifically mentioned that she needed and asked for permission to enter Defendant's residence the first time she testified about the encounter. Hr'g Tr. at 11 ("I . . . asked for permission to enter the home."). Afterward, Brandt unwaveringly reiterated that she obtained Defendant's consent. See id. at 12 ("We asked [Defendant] if we could come in and take a look around. He consented."), 22 (stating on cross-examination that Defendant consented), 26 (explaining on redirect examination that she obtained consent), 31-33 (answering the Court's questions that Defendant provided consent). This is clear and positive testimony that satisfies the Government's burden. Worley, 193 F.3d at 385.

In finding that the Government has met its burden in providing clear and positive testimony, the Court rejects Defendant's argument that Brandt's testimony is undermined by her references to her testimony at Defendant's parole violation hearing in April 2013 and by her understanding of the state of Michigan law in August 2012. Def. Supp. Br. at 7-8. Defendant argues that, because Brandt did not testify about Defendant providing consent at the parole hearing, Brandt failed to provide "clear and positive" testimony at the evidentiary hearing on the instant motion. Def. Supp. Br. at 6-7. However, Brandt testified that consent was not an issue at the parole hearing. Hr'g Tr. at 25. Defendant has no rebuttal to this assertion by Brandt. And,

6

as recounted above, Brandt testified consistently and credibly regarding Defendant's consent in the evidentiary hearing.

Similarly, Defendant's argument based on Brandt's alleged confusion regarding the state of the law in 2012 concerning a parolee's consent right misses the mark.[1]  Defendant asserts that Brandt's "apparent misunderstanding of a parolee's right to refuse entry left no room for meaningful 'consent.'"  Def. Supp. Br. at 8.  Defendant highlights Brandt's statements that on routine parole-compliance checks, officers (i) could enter a home unannounced, (ii) would only refrain from entering a home if entry could only be gained by force, (iii) conducted compliance checks while armed, and (iv) would advise parolees that failure to consent would violate conditions of their parole.  See id. (citing Hr'g Tr. at 17-18, 31, 37, 44, 59).  Yet, there is no confusion in the record that Brandt consistently testified that she requested and obtained Defendant's consent.  Whether or not Brandt provided a clear recitation of the state of the law is beside the point; on the issue of consent, Brandt clearly and positively testified that Defendant consented to the routine compliance check.[2]

To the extent that Defendant suggests that the officers coerced Defendant because they were armed, no one testified that the officers had drawn their firearms and, thus, the Court finds no basis for coercion arising from the fact that the officers were armed.  United States v. Erwin, 155 F.3d 818, 823 (6th Cir. 1998) (finding no coercion where officers "did not make any show of

---

[1] In August 2012, Michigan law did not dictate that a parolee must provide consent prior to being released on parole.  In December 2012, the Michigan Legislature revised Michigan's parole practices by requiring prospective parolees to provide written consent for compliance checks prior to release on parole.  See Mich. Comp. Laws § 791.236(19).  On cross-examination, Brandt exhibited some confusion as to what the law required at the time she conducted the compliance check of Defendant.  Hr'g Tr. at 15-17.  Brandt's testimony on the state of Michigan law, however, does not undermine her testimony that she asked Defendant for his permission to enter and search his residence.

[2] Indeed, as Defendant admits, Brandt "rehabilitated her testimony somewhat on redirect and in response to the Court's questions."  Def. Supp. Br. at 4.

7

force, such as drawing their weapons or touching the defendant; and both deputies testified that they did not employ stern or threatening language").

The Court also rejects Defendant's argument that the police report written by Officer Trevino undermines the strength of Brandt's testimony and makes the instant case "identical to United States v. Green, 277 F. Supp. 2d 756 (E.D. Mich. 2003)" because the report does not mention consent. Def. Supp. Br. at 7-8. Trevino's report is generally consistent with Brandt's testimony, thus corroborating it. See Trevino Report (Dkt. 16-2). While it is true that the report — the only written document in the record — is silent on whether Defendant consented to the search of his residence, Brandt, an MDOC supervisor, did not write the report or work for the law enforcement agency of the report's author, the Flint Police Department. Notably, Defendant does not mention the other report that Brandt testified about — the case note written by her supervisee, Officer Meylan. According to Brandt, the case note reflects that Defendant consented to the search. Hr'g Tr. at 29-30.

These facts also distinguish the instant case from Green, where the court granted a defendant's motion to suppress because it detected inconsistencies between (i) a police officer's report, written after a search in July 2001, that was silent on whether a defendant consented to the search of the defendant's vehicle; (ii) the officer's supplemental report, written in November 2001 at the request of the prosecutor, that first referenced consent from the defendant, and (iii) the officer's testimony at an evidentiary hearing in May 2003 that the report's initial silence was an "inadvertent" omission. Green, 277 F. Supp. 2d at 759-761. In granting the motion, the court found that the supplemental report was an effort to "clean up a bad search." Id. at 760 (quotation marks omitted). The court further found that the initial report's silence on the issue of consent played a significant factor in warranting suppression. Id. at 761. However, in this case, the

record makes it plain that Green is inapposite. Unlike the officer in Green, Brandt did not author the Flint Police Department report; Brandt testified unswervingly that she obtained consent. The Court also does not detect any "gamesmanship," id. at 760, because Brandt did not supplement a report at the request of anyone, unlike in Green where the prosecutor sought clarification regarding consent. Rather, it is worth reiterating that Brandt testified that the MDOC case note written by Officer Meylan referenced consent and that this testimony buttressed Brandt's initial testimony that Defendant consented to the search.

      Finally, the Court concludes that the testimony of the defense witnesses is not credible and does not support a finding that the officers failed to obtain consent. First, Lotts's narration of events does not support the defense because he was inside the residence and not in the immediate presence of Brandt when she requested entry into the residence and permission to search the residence. Second, Lotts was not free from bias because he is related to Defendant. See United States v. Jackson-Randolph, 282 F.3d 369, 383 (6th Cir. 2002) ("Bias is the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."(quotation marks omitted)). Third, Defendant's account of the events is of limited weight because of his exchange with Brandt and Trevino. Defendant testified that his room was on the right, but then Trevino promptly searched the left room. Id. at 64. Defendant then testified that he did not say anything to the officers and did not try to stop their search. Id. at 68-69. This stands in contrast to Brandt's testimony that, only after Trevino discovered the firearm, did Defendant clarify that Trevino went into the wrong room. Id. at 30. The Court finds that Defendant's account is not a credible account of the events and does not undercut the clear and positive testimony of Brandt that Defendant consented to the search of his residence.

## IV. CONCLUSION

For all of the above reasons, the Court denies Defendant's motion (Dkt. 10).

SO ORDERED.

Dated: March 7, 2014  s/Mark A. Goldsmith
      Flint, Michigan  MARK A. GOLDSMITH
  United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 7, 2014.

  s/Deborah J. Goltz
  DEBORAH J. GOLTZ
  Case Manager