UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

Case No. 13-20337

v

HON. MARK A. GOLDSMITH

JALON RASHOD BROWN,

    Defendant.

_____/

**OPINION & ORDER
FINDING BROWN VIOLATED HIS ORDER OF SUPERVISED RELEASE, AND
DENYING HIS MOTION FOR REVOCATION OF HIS DETENTION ORDER (Dkt. 40)**

Defendant Jalon Rashod Brown pleaded guilty to felon in possession of a firearm (Dkt. 20). He was sentenced to a custodial sentence of fifty-seven months, to be followed by a three-year term of supervised release. Brown's supervised release began on July 31, 2018 (Dkt. 30). On August 29, 2019, Brown's probation officer filed a petition for a warrant, alleging that Brown had made the following supervised release violations:

1. Resisting arrest (Violation 1);

2. Associating with a convicted felon (Violation 2); and

3. Failing to attend counseling appointments (Violation 3).

8/30/19 Order with Petition for Issuance of Warrant for Violation (Dkt. 30). Brown was arrested and ordered detained pending a supervised release violation hearing (Dkt. 35).

A district court may revoke a term of supervised release if it finds "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C § 3583(e)(3); see also United States v. Cofield, 233 F.3d 405, 406 (6th Cir. 2000) (same). Brown's supervised release conditions state, among other things, that Brown must "not commit another federal, state

or local crime," must not "associate with any person convicted of a felony," and must "participate in a program approved by the probation department for mental health counseling." Judgment at 3-4 (Dkt. 21).

A supervised release hearing was held on September 24, 2019. During the hearing, Brown admitted responsibility for failing to attend his counseling appointments at the Sacred Heart Rehabilitation Center in Flint, Michigan. However, he contested whether he had violated Michigan law in refusing a state trooper's command to stop after Brown fled from the vehicle that the trooper had pulled over in a traffic stop. Both the Government and Brown filed briefs with respect to whether or not Brown violated his supervised release by resisting a police officer's command (Dkts. 37, 38). Brown has also filed a motion for revocation of his detention order in light of the COVID-19 pandemic (Dkt. 40), to which the Government filed a response brief (Dkt. 41).

For the reasons that follow, the Court finds that the Government has established, by a preponderance of the evidence, that Brown violated the conditions of his supervised release.[1] The Court also denies Brown's motion for revocation of his detention order.

## I. BACKGROUND

The facts giving rise to Brown's arrest are largely not in dispute. At approximately 1:00 a.m. on August 13, 2019, State Troopers Andrew Fill and Keith Bieganski were patrolling along Stuart Avenue in Flint, Michigan. They pulled over a gold-colored Chevrolet Equinox travelling westbound, because they were unable to see a license plate displayed on the vehicle. When the vehicle came to a stop, the patrol car's spotlights illuminated a paper plate displayed in the back

---

[1] In the Government's supplemental brief, it moved to dismiss the associating with a convicted felon supervised release violation, Gov't Supp. Resp. at 10-11, which the Court now grants.

2

window. Fill testified that it was difficult to see the paper plate in the back window because the window was tinted.

There were three individuals in the Equinox. Deshawn Nunley was the driver, Brown was in the front passenger seat, and an individual identifying himself as Hameen Upchurch was in the backseat. The troopers returned to their vehicle to run Nunley's driver's license through the Law Enforcement Information Network ("LEIN") and Secretary of State records ("SOS"). They discovered that Nunley's driver's license was expired. The troopers did not find any issues with respect to Brown, but were unable to locate a Hameen Upchurch in LEIN or SOS, and, therefore, could not confirm his identity.

The troopers returned to the Equinox and arrested Nunley for operating a vehicle with an expired license. They also verified the spelling of Upchurch's name and returned to their vehicle to run the name again. While running Upchurch's name through LEIN and SOS a second time, the troopers saw the front passenger door and back left door open simultaneously. Brown exited the car and ran west, and Upchurch exited the car and ran east. Trooper Fill pursued Brown on foot, and Trooper Bieganski pursued Upchurch. Fill testified that he observed Brown holding his waistband as he was running, which he suspected was to keep a weapon in place.

Brown jumped over a nearby fence, and Fill followed. According to Fill, he repeatedly gave loud verbal commands for Brown to stop, which Brown ignored. Finally, after jumping several fences and running through front and back yards on Winona Street, Fill deployed his taser, which caused Brown to fall to the ground. Fill testified that Brown continued to attempt to flee, so he used the taser two more times before Brown became compliant and put his hands behind his back to be handcuffed. Brown was arrested and taken back to the patrol vehicle.

3

After Fill arrested Brown, he walked the route that he had used to pursue Brown. On that walk, Fill found a loaded handgun in one of the back yards. No other contraband was found on Brown, Nunley, or in the Equinox. Upchurch was not found.

## II. ANALYSIS

Brown argues that he did not obstruct Trooper Fill within the meaning of Michigan Compiled Laws § 750.81d, and that his detention order should be revoked. The issues will be taken in turn.

### A. Supervised Release Violation

Brown argues that Fill did not give him a lawful command and, therefore, he did not resist or obstruct an officer within the meaning of Michigan Compiled Laws § 750.81d. Def. Supp. Br. at 4. In Michigan, it is a felony to "obstruct" an officer by failing to comply with an officer's lawful command. Mich. Comp. Laws § 750.81d(1), (7)(a); see also People v. Moreno, 814 N.W.2d 624, 634 (Mich. 2012) (holding that section 750.81d did not abrogate the common-law right to resist an unlawful arrest). The Government argues that Fill's command to Brown to stop fleeing from the traffic stop was a lawful command and, therefore, Brown resisted or obstructed an officer when he failed to comply with Fill's command. The Government has the better part of the argument.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. If a motorist is stopped by police officers, he has been "seized" within the meaning of the Fourth Amendment. United States v. Pacheco, 841 F.3d 384, 389-90 (6th Cir. 2016) (citing Brendlin v. California, 551 U.S. 249, 256-59 (2007)). Therefore, "a police officer may stop a vehicle only if the officer 'possess[es] either probable cause of a civil infraction or reasonable suspicion of criminal activity.'" Brown v. Chapman, 814 F.3d 447, 457 (6th Cir. 2016) (alteration

4

in original) (quoting United States v. Lyons, 687 F.3d 754, 763 (6th Cir. 2012)). Here, there is no dispute that the officers had justification for the initial traffic stop, because the Equinox was being driven without any visible license plate. The dispute in this case centers on when that seizure should have ended.

Brown argues that the traffic stop should have ended as soon as the troopers spotted the paper license plate in the back window of the Equinox. Def. Supp. Br. at 5-6. Not so. Fill testified that he and his partner could not see the paper plate in the back window because of the Equinox's rear window tint. Fill explained that although the paper plate appeared to be valid and that there was nothing improper about the tint on the rear window, the paper plate was improperly displayed because he and his partner could not see it clearly. See Mich. Comp. Laws § 257.225(1)-(2) (providing that a license plate must be clearly visible from the rear of the vehicle).

After conducting a lawful traffic stop, police officers may investigate the suspected traffic violation for as long as is reasonably necessary to complete that task and, if necessary, issue a traffic ticket. Rodriguez v. United States, 575 U.S. 348, 354 (2015). Additionally, officers may make ordinary inquiries incident to the traffic stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," so long as those inquires do not measurably increase the duration of the traffic stop. Id. at 355; see also Arizona v. Johnson, 555 U.S. 323, 333 (2009) (same). These inquires can also include "asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing by the passengers." United States v. Alexander, 467 F. App'x 355, 362 (6th Cir. 2012); see also United States v. Smith, 601 F.3d 530, 542 (6th Cir. 2010) ("Nor was it inappropriate for [the officer] to check both whether [the driver and passenger] had valid identification and whether they had any outstanding warrants."). Finding

5

a valid paper plate on the Equinox did not end the stop, because the troopers still needed to determine whether to issue a traffic ticket. See Rodriguez, 575 U.S. at 354-355. Therefore, the tasks tied to the traffic stop were not completed, and it was appropriate to investigate the identities of the Equinox's occupants.

Brown also argues that there was no continuing justification to detain him once Nunley had been arrested, because the troopers had no reason to continue detaining him. Def. Supp. Br. at 6. He argues that he was free to leave the encounter. Id. The Government argues that the troopers had reasonable suspicion to detain Brown based on his unprovoked flight and other factors. Gov't Supp. Br. at 8-9. The Government is correct.

Traffic stops are analogous to a so-called Terry stop. Rodriguez, 575 U.S. at 354 (citing Terry v. Ohio, 392 U.S. 1 (1968)). Officers may conduct a brief, investigatory stop—a Terry stop—when an officer has a reasonable, articulable suspicion that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Reasonableness, under the Fourth Amendment, "is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996).

Here, after the troopers had arrested Nunley and were making a second attempt to determine if information about Upchurch could be located, Brown and Upchurch simultaneously flung open their doors and fled headlong in opposite directions. "[A]n individual's unprovoked flight [is] sufficient to give officers reasonable suspicion to conduct a Terry stop." United States v. Jeter, 721 F.3d 746, 753 (6th Cir. 2013) (citing Wardlow, 528 U.S. at 125). It may have been stressful to see Nunley being arrested, but the troopers did nothing to provoke Brown's flight. See Jeter, 721 F.3d at 754 ("While the officers' convergence upon the parking lot with several police cruisers and a helicopter may have been grand in scope compared to the crime they were

6

investigating and, as such, intimidating, Jeter fled in a manner suggesting an attempt to escape from law enforcement."). Additionally, Fill observed Brown holding his waistband, which, based on his experience, suggested that Brown was holding a weapon in place. Based on the totality of the circumstances, Fill had reasonable suspicion to conduct a Terry stop, and, therefore, Fill's command to Brown to stop was lawful.

Brown's failure to comply with Fill's lawful command violated Michigan Compiled Laws § 750.81d. Accordingly, the Court finds by a preponderance of the evidence that Brown committed a felony in violation of his order of supervised release.

## B. Motion for Revocation of Detention

Brown also seeks revocation of his detention order under 18 U.S.C. § 3145(b) in light of the risks posed by the COVID-19 pandemic. Brown was ordered detained pending further proceedings by Magistrate Judge Michael Hluchaniuk (Dkt. 35). The release or detention of a federal defendant pending sentencing is governed by 18 U.S.C. § 3143. A defendant awaiting the imposition of a sentence must be detained, unless the court finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community. 18 U.S.C. § 3143(a)(1). Release is not favored once guilt of a crime has been established. United States v. Vance, 851 F.2d 166, 170 (6th Cir. 1988). The burden is on the defendant to prove release is warranted. Id. at 168.

In determining whether a person is likely to flee or pose a danger to the community, the Court must evaluate the available information concerning: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g).

7

Under 18 U.S.C. § 3142(i), a judicial officer may "permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Some courts have held that the COVID-19 pandemic presents a compelling reason justifying pretrial release. See, e.g., United States v. Kennedy, No. 18-20315, 2020 WL 1493481, at *4 (E.D. Mich. Mar. 27, 2020).

Applying the § 3142(g) factors below, however, the Court finds that Brown has not met his burden of proving that he would not present a risk of flight and a danger to the community were he to be released. Further, Brown has not established that COVID-19 presents a unique and compelling risk to him personally that would justify his release under § 3142(i).

### 1. Nature and Circumstances—18 U.S.C. § 3142(g)(1)

Under 18 U.S.C. § 3142(g)(1), this Court is to consider the nature and circumstances of the offense charged, including whether the offense involves a controlled substance, firearm, explosive, or destructive device.

Here, Brown violated his supervised release when he took flight from a routine traffic stop, which led to a police chase over fences and through backyards. After the chase was complete, Trooper Fill recovered a loaded firearm on the path of the pursuit. This occurred while Brown was on supervised release for illegally possessing a firearm. Thus, when considered in the context of Brown's criminal history, the offense charged is serious and weighs in favor of his detention.

### 2. Weight of the Evidence—18 U.S.C. § 3142(g)(2)

Title 18 U.S.C. § 3142(g)(2) instructs this Court to consider "the weight of the evidence against the person." The factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." United States v. Stone, 608 F.3d 939, 948 (6th

8

Cir. 2010); see also United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985) (weight-of-evidence factor "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community").

Here, the weight of the evidence of Brown's dangerousness and risk of non-appearance is strong. As detailed in the Government's response to the motion, in addition to fleeing from a traffic stop and likely discarding a loaded weapon as he was being pursued, Brown's criminal history further confirms his dangerousness: he has unlawfully entered a home to steal a gun, robbed a person at gunpoint, possessed a firearm related to a drug-trafficking offense, and he has twice violated the conditions of his supervision. Resp. at 3-5 (citing presentence report). Accordingly, this factor favors detention.

### 3. History and Characteristics—18 U.S.C. § 3142(g)(3)

Under this factor, this Court must consider the following:

> [T]he history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . .

18 U.S.C. § 3142(g)(3).

As described above, Brown's criminal history shows a steady pattern of illegal firearm possession and drug related offenses. And while he was on supervised release, he violated the terms of his release by failing to attend his counseling sessions at Sacred Heart Rehabilitation

9

Center in Flint, Michigan, and by obstructing Trooper Fill's lawful commands. Accordingly, Brown's history and characteristics favor his detention.

### 4. Danger to Community—18 U.S.C. § 3142(g)(4)

Under the pertinent part of 18 U.S.C. § 3142(g)(4), this Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

Here, the evidence demonstrates that Brown had no regard for the conditions of his supervised release. Brown has engaged in criminal behavior even while on supervised release. Further, Brown has a history of dangerous criminal activity. As with the other § 3142(g) factors, this factor weighs in favor of Brown's detention.

### 5. COVID-19

Brown also contends that his release is warranted in light of the health risks posed by continued incarceration during the COVID-19 pandemic. Mot. at 6-7. The Court is mindful of the exceptionally grave and unprecedented nature of COVID-19, which has continued to spread exponentially throughout the State of Michigan. And as acknowledged by the Centers for Disease Control and Prevention ("CDC"), incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities. See Kennedy, 2020 WL 1493481, at *2. These conditions include, among other things, the highly congregational environment, the limited ability of incarcerated persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing), and potentially limited onsite healthcare services. Id.

While the generalized risks of COVID-19 cannot be disputed, courts evaluating whether release from custody is necessary must evaluate the particularized risks posed to an individual

10

defendant. See United States v. Lee, No. 19-20112, 2020 WL 1540207, at *3 (E.D. Mich. Mar. 30, 2020). Some courts evaluating the impact of COVID-19 on the pretrial release calculus have considered the following four factors:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

United States v. Clark, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020).

First, as discussed above, the § 3142(g) factors demonstrate that Brown presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety the community or his appearance in court. This factor weighs in favor of Brown's continued detention.

Second, Brown has not raised any specific health concerns. Brown concedes that there have been a relatively small number of COVID-19 cases in Clare County,[2] where Brown is incarcerated. However, Brown argues that a few cases today can be hundreds of cases in a few weeks. Mot. at 7. Certainly COVID-19 can spread quickly, but presently there have been no reported cases of inmates or staff contracting COVID-19 at the Clare County Jail.

Additionally, the Clare County Jail has instituted precautionary measures to reduce the risk of infection including (i) limiting physical jail visitations (although video visits are still occurring) (ii) screening all newly-arriving detainees for COVID-19, (iii) isolating all new arrivals for fourteen days as a matter of course, (iv) quarantining symptomatic detainees with exposure risk factors until they are medically cleared, (v) increasing cleaning regimens and providing extra

---

[2] According to Michigan's website, there have been eleven confirmed cases of COVID-19 in Clare County and one death. See https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (last visited on April 29, 2020).

clearing supplies to detainees, (vi) bringing meals to detainees' cells, (vii) screening all staff on a daily basis for COVID-19 symptoms. Resp. at 11-12. This factor, therefore, also weighs in favor of Brown's continued detention.

Third, Brown has not explained how his release would minimize his risk of contracting COVID-19. He says that he would stay with his significant other, Latrese Brown, but he does not identify any COVID-19 precautions being implemented in Ms. Brown's home or why they are superior to measures already being undertaken in the Clare County Jail. This factor weighs in favor of Brown's continued detention.

Finally, Brown's release would increase the risk of others contracting COVID-19. As other courts have recognized, "'[a] defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.'" United States v. Smoot, No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020) (quoting Clark, 2020 WL 1446895, at *7); see also United States v. Aiad-Toss, No. 19-00521, 2020 WL 1514482, at *2 (N.D. Ohio Mar. 30, 2020) (noting that releasing a defendant to home detention and electronic monitoring unduly burdens pretrial services officers, who must perform installation and monitoring). Brown's history of violating supervised release and fleeing from troopers increases the risk to others of contracting COVID-19. Consequently, this factor likewise favors Brown's continued detention.

In sum, these factors do not demonstrate that Brown's release pending sentencing is warranted in light of the risks presented by the COVID-19 pandemic.

12

## III. CONCLUSION

For the reasons discussed above, the Court finds by a preponderance of the evidence that Brown obstructed a police officer within the meaning of Michigan Compiled Laws § 750.81d, and that he failed attend his counseling at the Sacred Heart Rehabilitation Center in Flint, Michigan, both of which violate the terms of his order of supervised release. Additionally, Brown's motion for revocation of his detention order (Dkt. 40) is denied because Brown is a flight risk and a danger to the community.

SO ORDERED.

Dated: May 1, 2020  s/Mark A. Goldsmith
 Detroit, Michigan MARK A. GOLDSMITH
  United States District Judge